

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00041-CR

_____

RYAN JEFFERSON MEAD, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1573226D

---

Before Birdwell, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

This case concerns the serious bodily injury suffered by four-week-old Ora.[1] A jury convicted her father, Appellant Ryan Mead, of committing injury to a child by omission and aggravated assault of a family member with a deadly weapon.[2] Tex. Penal Code. Ann. §§ 22.02(a)(1), 22.04(a). The jury assessed his punishment at twenty-five years' confinement on each count, and the trial court sentenced him accordingly, ordering the sentences to run concurrently. *Id.* §§ 22.02(b)(1), 22.04(e). Mead brings four issues: (1) the trial court abused its discretion by limiting the testimony of his expert witnesses, (2) the trial court abused its discretion by allowing the State to testify outside the record about the opinions of four of its expert witnesses who did not testify at trial, (3) the evidence is insufficient to support his conviction for injury to a child by omission, and (4) the evidence is insufficient to support his conviction of aggravated assault of a family member. Because we hold that the evidence is sufficient to support Mead's convictions and that the trial court did not reversibly err, we affirm the trial court's judgments.

---

[1]We use aliases to protect the identities of the complainant and her sister, who are minors. *See* Tex. R. App. P. 9.10(a)(3); 2d Tex. App. (Fort Worth) Loc. R. 7.

[2]The jury acquitted Mead of intentionally or knowingly causing serious bodily injury to a child by shaking or jerking her with his hand or by hitting her against a soft or hard object. *See* Tex. Penal Code Ann. § 22.04(a).

## I. Statement of Facts

## A. The Development of Ora's Symptoms

In late September 2018, Ora was four weeks old. She lived with her parents, Mead and M.O. (Mother), and her eighteen-month-old sister, Ophelia, in Arlington, Texas. Mother's pregnancy with Ora was normal, and Ora's birth was natural with no complications. According to Mother, Ora cried and spat up frequently.

On Saturday, September 29, 2018, Mother left the apartment twice: she picked up food at Panera during the day and went to Target that night. On both occasions, she left Mead alone with the children. Ora fed normally on Saturday and when Mother fed her at approximately 7:00 a.m. on Sunday morning.

At around 10:00 a.m. on Sunday morning, Mother left the apartment to pick up breakfast, again leaving Mead alone with the children. She returned to the apartment around 11:30 a.m. or noon and attempted to feed Ora. However, Ora projectile vomited all of the breastmilk immediately after consuming it. Mead later described the vomit in a police interview as the most he had ever seen. Ora had thrown up a few times before but would always behave and feed normally afterwards. Mother cleaned her up, and the family went to the park, where Ora projectile vomited again after Mother attempted to feed her. The family soon left the park to return home. Ora projectile vomited in the car. After returning home, Mother took Ophelia back to the park, leaving Mead to bathe Ora.

While bathing Ora, Mead noticed that she was making grunting sounds and breathing irregularly. He also noticed that Ora was sucking in her stomach so hard that he could see the outlines of her intestines. He thought that she may have been constipated.

After spending about an hour in the park with Ophelia, Mother returned home. She did not try to feed Ora again. The family then drove to Kennedale. Ora did not throw up on the trip. By the time they returned home, it was 8:00 or 9:00 p.m. Mother was concerned that Ora had not eaten anything that day, was acting sluggish, and appeared pale. Mother called her mother to ask for advice and gave Ora gripe water. Mother attempted to feed Ora again without success. Ora would not take any breastmilk and threw up again. Mother noticed that Ora was breathing irregularly. Mother considered taking Ora to an urgent care center, but Mead told her they should wait for Ora's unrelated appointment with the pediatrician that was already scheduled for the following afternoon.

Mead told the police that he had stayed with Ora through Sunday night and into the early hours of Monday, October 1. He had tried to feed her a few more times but told the police that she had been unable to keep anything down. He had noticed that Ora was not very alert and was making a strange cry.

**B. Ora's Medical Treatment**

On the morning of October 1, Mother took Ora to her pediatrician in Arlington. Upon examining Ora, the pediatrician immediately became concerned and

4

told Mother to take the baby to the emergency room at Cook Children's Medical Center in Fort Worth (Cook Children's). Mother complied. Soon after arriving at Cook Children's, Ora began decompensating and had to be intubated.

The doctors at Cook Children's performed a physical exam of Ora. She had no broken bones but did have bruises on her right forearm and lower left leg. A CT scan revealed acute bleeding all over her brain, a lack of oxygen in her brain, and brain swelling so severe that the growth plates in her skull were pushed apart. A cervical-spine MRI revealed ligament injuries in Ora's neck and blood in her spinal subdural area that the doctors believed was "tracking down from the brain." Dr. Michael Hunt, a pediatric ophthalmologist, examined Ora and determined that she had retinal hemorrhages throughout her right eye, an injury consistent with traumatic or inflicted injury to one side of the head. It was later revealed that Ora had also suffered a stroke[3] and had been having seizures. The doctors at Cook Children's suspected that these were the products of a traumatic injury and subsequent lack of oxygen in the brain.

---

[3]Dr. Daniel Hansen testified that Ora

> did not have . . . what we would consider a stroke from an adult standpoint, where one of her small blood vessels clotted off and it caused a small area of her brain to die.
>
> . . . [I]n a very general sense, she had a global stroke where her entire brain died because of lack of blood flow or injury.

Mead's expert, Dr. Joseph Scheller, disagreed. He testified that Ora had a typical stroke, not a global stroke.

After reviewing Ora's symptoms, doctors diagnosed her injury as abusive head trauma caused by either a violent shake, jerk, or hit. All of her symptoms were consistent with abusive head trauma. In coming to this conclusion, the doctors reviewed her birth and pediatric records and determined that she had no underlying disorders that may have caused these injuries.

Due to a lack of oxygen, almost all of Ora's brain died, leaving her unable to see, walk, speak, or eat on her own. She will never recover.

### C. The Investigation and Mead's Explanation

Dr. Jamye Coffman, the medical director of Cook Children's child abuse team, reviewed Ora's information and talked to Mother and Mead, seeking a possible explanation for Ora's injuries. Neither Mother nor Mead was able to provide a likely explanation. Both parents mentioned an incident that had occurred about a week earlier. Ophelia had accidentally head-butted Ora, splitting open Ora's lip. Ora did not display any other symptoms after the head-butt. Dr. Coffman explained at trial that she did not believe that a toddler's accidentally head-butting Ora could have caused her injuries. When Dr. Coffman asked Mead about the bruises on Ora, he suggested that Ophelia may have caused them "because she like[d] to pull on the baby."

After Ora's injuries were diagnosed as abusive head trauma with no known cause, Detective Jonlee Martinez from the Arlington Police Department opened an investigation. He interviewed Mother and Mead separately on the afternoon of October 1, but neither told him anything that could explain Ora's injuries.

6

The next day, Tuesday, Mead revealed a potential explanation for the injuries. Mead explained to Detective Martinez that on the previous Saturday night, while Mother was at Target, Ora fell off the couple's bed, which was a mattress sitting on top of a box spring on the carpeted floor. Mead stated that at around 9:45 p.m., he was lying in bed with Ora when Ophelia woke up. He placed Ophelia in the bed with Ora and him and fell asleep, waking up again sometime between 10:00 and 10:15 p.m. to see Ophelia pulling Ora off the bed. Ora's head was already hanging off the bed, and she was beginning to fall. Mead told the detective that he quickly grabbed Ora's leg, caught her midair as she fell from the bed, and jerked her back up to his chest. He said that when he pulled her up, he "felt her neck jerk," and then she "slumped back forward." Mead told Detective Martinez that he may have caused the bruise on Ora's leg when he grabbed her. Mead denied ever violently shaking Ora or hitting her against any objects.

When Detective Martinez asked Mead why he had not told anyone about this incident earlier, Mead initially said that he forgot because he was so tired and did not think the incident could have caused her injury. Mead also claimed that he was scared and "didn't know how to tell" Detective Martinez and the doctors at Cook Children's. Mead said several times in his interviews with Detective Martinez that he "did this" and was responsible for what happened to Ora but that he had not injured her purposely. Detective Martinez testified at trial that he believed that Mead was

"minimizing" his actions and "altering the truth" by telling a story of how he saved Ora from falling to the ground.

The doctors at Cook Children's did not believe that the incident Mead reported could have caused Ora's injuries. First, the doctors did not believe that the motions, as Mead described them, were forceful enough to cause the injuries. Second, Ora fed normally twice after the alleged incident on Saturday night and did not begin to exhibit symptoms until Mother fed her between 11:30 a.m. and noon on Sunday morning. Because of how dramatically the symptoms began and how quickly Ora deteriorated, the doctors believed that the traumatic event must have happened on Sunday morning, sometime between the 7 a.m. feeding and the lunchtime feeding, when Ora projectile vomited for the first time that weekend.[4]

Ultimately, the doctors and Detective Martinez concluded that Ora's injuries were the result of abuse. Detective Martinez issued an arrest warrant for Mead, and a grand jury indicted him for three offenses: (1) intentionally or knowingly causing serious bodily injury to a child by shaking or jerking her with his hand or by hitting her against a soft or hard object; (2) intentionally or knowingly causing serious bodily injury to a child by omission for failure to seek medical help, and aggravated assault of a family member.

---

[4]Evidence showed that Ora had projectile vomited twice in the hospital soon after her birth and on two other occasions before doing it five times within less than twenty-four hours preceding her admission to Cook Children's.

8

## D. Expert Testimony on Ora's Injuries

Mead's jury trial lasted several days. Experts for both the State and Mead testified about Ora's injuries and Mead's explanation for them. The State called several doctors who attended to Ora during her stay at Cook Children's, including Dr. Coffman and Dr. Hansen, as witnesses. During the defense's case, Mead called two expert witnesses: Dr. Joseph Scheller, a neurologist based in Baltimore who works with outpatients and does forensic work for attorneys, and Pamela Rast, Ph.D., a professor of kinesiology at Texas Wesleyan University.

### 1. Dr. Coffman's Testimony

Dr. Coffman expressed her concern that Ora had symptoms including projectile vomiting, lethargy, difficulty breathing, and a loss of appetite for almost twenty-four hours before receiving medical care. Dr. Coffman testified that the failure to receive timely medical care likely worsened Ora's injuries because had she received earlier treatment, doctors may have been able to prevent further brain damage by oxygenating her.

### 2. Dr. Hansen's Testimony

Dr. Hansen, a pediatric neurosurgeon, was called to testify about his examination of Ora and to explain the findings from the neuroimaging. He explained that the CT scan administered when Ora was admitted to Cook Children's showed fresh blood surrounding her brain, significant brain swelling, and a lack of blood flowing throughout the brain. Due to the acute nature of the blood, Dr. Hansen

estimated that Ora's injuries had occurred within a day or two of the CT scan. Additionally, he was concerned about how dramatically Ora's symptoms had begun. He explained that the traumatic event must have occurred on Sunday morning (September 30) between the 7 a.m. and lunchtime feedings.

Dr. Hansen then explained the findings from the MRI of Ora's brain. He testified that all parts of Ora's brain that appeared bright on the image were damaged. He next explained that almost all of Ora's brain appeared bright on the image, suggesting that Ora had suffered a severe, global injury. Dr. Hansen then compared Ora's MRI to an MRI of a patient who had suffered a stroke. He pointed out how the stroke patient's brain was only affected in the portion where the stroke occurred.

Next, Dr. Hansen addressed Ora's neck injuries. He testified that the X-rays taken of Ora's neck showed injured ligaments. He explained that these injuries likely occurred from a violent flexion of the neck, an injury consistent with shaking, jerking, or hitting.

Dr. Hansen also testified that projectile vomiting and lethargy are both common symptoms of brain injury. He stated that Ora should have received medical care much sooner, especially because she was symptomatic for twenty-four hours before her parents sought treatment. He opined that while Ora's fate was predominantly determined "the moment she was injured," her injuries were exacerbated by the delay of care. He had no way of knowing what he would have been able to do to treat her had she arrived at the hospital earlier. On cross-

examination, he admitted that had she arrived at the hospital two or three hours earlier, he did not believe it would have affected her outcome. He could not say whether her outcome would have been different had she arrived twelve hours earlier.

Near the beginning of his initial direct examination, Dr. Hansen had testified that he worked in the Cook Children's "neuroscience department, which is a group [of] neurologists and neurosurgeons" and that he was "one of four . . . pediatric-specific neurosurgeons" at Cook Children's. On cross-examination, Dr. Hansen testified that he believed his opinion about Ora's injuries was right and that it had been "in consultation with all of [his] colleagues." On redirect examination by the prosecutor, Dr. Hansen clarified that he had been "referring to [his] neurosurgical colleagues." He also testified that they agreed with his opinion on this case.

### 3. Dr. Scheller's Testimony

Mead's first witness in his case in chief was Dr. Scheller, a neurologist. During his Rule 705 hearing, Dr. Scheller explained to the trial court that he intended to use a demonstrative exhibit of retinal hemorrhaging caused by a retinal vein blockage to explain the origin of Ora's injuries, which were not caused by a retinal vein blockage but which he also believed were not a product of abuse. He believed Ora's injuries were caused by a blockage of the venous system in her brain. However, the trial court limited his testimony and excluded the demonstrative exhibit, stating that it was not relevant, that it was confusing, and that showing an image of something that did not

11

occur in this case would not be helpful to the jury. The excluded exhibit does not appear in the record.

Dr. Scheller testified before the jury that Ora's injuries were caused by a "very small but real stroke" in the cerebellum that triggered seizures, affecting blood flow to her brain. He testified that he did not believe trauma caused Ora's injuries because there were no other signs of trauma or abuse. Dr. Scheller also testified that the fluid in Ora's neck ligaments did not necessarily indicate an injury and could have instead been caused by the manipulation of Cook Children's personnel in intubating her or performing her CT and MRI scans.

During the State's cross-examination of Dr. Scheller, Dr. Scheller conceded that in his prior review of the medical records, he had not seen any evidence that any Cook Children's doctor agreed with his diagnosis. Shortly afterward, the prosecutor told Dr. Scheller that the four pediatric neurosurgeons at Cook Children's "agree[d] with the findings that are contained in the" box of Cook Children's doctors' medical reports on Ora's case that Dr. Scheller had reviewed and asked him if he "disagree[d] with those four neurosurgeons." Defense counsel objected that whether the neurosurgeons agreed with the medical reports was not in evidence because they had not testified. The prosecutor responded that State's expert Dr. Hansen had testified that he had "reviewed this information with his colleagues, and that's what [the prosecutor was] referring to." Defense counsel replied that "it was not made clear who those colleagues were." The trial court overruled the objection, and Dr. Scheller

12

answered the question: "I have to take your word for it. I don't know that there were four neurosurgeons involved." The prosecutor then asked the question a different way: "[D]o you realize that your theory is contrary to the opinion of those four pediatric neurosurgeons?" Defense counsel did not object, and Dr. Scheller answered, "I for sure know that it's contrary to one, but I can't say about the others. But if that's the case, that's fine."

**4. Professor Rast's Testimony**

During the Rule 705 hearing of Professor Rast, Mead's second expert witness, she explained to the court that Fort Worth Emergency Medical Services (EMS) had discontinued prehospital use of C-collars on patients who had suffered brain injuries due to the C-collars' potential for exacerbating the injuries. When the trial court asked how that information applies to this case, Professor Rast stated that Ora had been placed in a C-collar. The trial court did not permit Professor Rast to testify before the jury about the potential dangers of using C-collars because she could not draw "any kind of conclusion regarding" whether the C-collar had "anything to do with" Ora's injuries.

Professor Rast testified before the jury that she did not believe that Ora's injuries could have been caused by shaking, jerking, or hitting because Ora had no skeletal injuries and her only external bruising was on her arm and leg. Professor Rast explained that in an abusive head trauma case, she would expect to see bruising on the

13

infant's torso, a separation of the growth plates, and other external signs of injury. She saw no signs of those here.

## II. Sufficiency of The Evidence[5]

In his third and fourth issues, Mead contends that the evidence admitted at trial is insufficient to support his two convictions.

### A. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend XIV. In our evidentiary-sufficiency review, we view all evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*,

---

[5]We address Mead's sufficiency issues (Issues Three and Four) before his evidentiary issues (Issues One and Two) because if sustained, the sufficiency issues could give him the greatest relief. *See* Tex. R. App. P. 43.3; *Roberson v. State*, 810 S.W.2d 224, 225 (Tex. Crim. App. 1991), *see, e.g., Dumas v. State*, No. 02-19-00071-CR, 2020 WL 3730790, at *2 (Tex. App.—Fort Worth July 2, 2020, pet. ref'd) (mem. op., not designated for publication).

14

542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.* (quoting *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014)); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see also Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the

factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

We must scrutinize circumstantial evidence of intent as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). But when a record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and [we] must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991) (quoting *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990)).

## B. Count Two: Injury to a Child by Omission

In Count Two, Mead was charged with intentionally or knowingly causing serious bodily injury by omission to Ora, a child younger than fifteen years old, for failing to obtain timely medical care for her when he had assumed care, custody, or control of her or had a legal duty to act because he was her father. *See* Tex. Penal Code Ann. § 22.04(a)(1), (b), (c)(1). It is undisputed by the parties that at the time of the offense,

- Ora was a child younger than fifteen years old, as she was only four weeks old when her injuries occurred;

- Mead was Ora's father and therefore had a legal duty to act, *see id.* § 22.04 (b)(1); and

- Ora's injuries, including severe brain swelling and bleeding that resulted in permanent brain damage, qualified as serious bodily injury. *See id.* § 1.07(a)(46) (defining "serious bodily injury" as "bodily injury that

16

creates a substantial risk of death[,] . . . serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ").

Mead challenges the proof supporting the requisite mental state and the proof of causation.

### 1. *Mens Rea*

Mead's central argument is that the evidence is insufficient to prove that he intentionally or knowingly failed to obtain timely medical care for Ora. Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "A person acts intentionally . . . with respect to . . . a result of his conduct when it is his conscious objective or desire to . . . cause the result." Tex. Penal Code Ann. § 6.03(a). Further, "[a] person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). To prove that a defendant knowingly caused a child's injury by omission, the State must prove that the defendant was aware with reasonable certainty that the injury would have been prevented had the defendant performed the omitted act. *Payton v. State*, 106 S.W.3d 326, 331 (Tex. App.—Fort Worth 2003, pet. ref'd).

To support his position, Mead argues that Ora's only visible symptoms and injuries were the vomiting, lethargy, and two bruises, and he insists that none of these symptoms were cause for alarm. First, Mead argues that the bruises were sufficiently

17

explained by his report that he grabbed Ora when she fell off the bed and that they did not pose a risk of serious bodily injury. He therefore concludes that Ora's bruises could not be a basis for a finding that he intentionally or knowingly caused serious bodily injury by failing to take her to the doctor sooner.

Second, Mead claims that Ora threw up every day, so her vomiting was not an immediate cause for concern. However, the evidence that Ora spit up daily was markedly different from the evidence that she repeatedly projectile vomited on September 30. Mother testified that Ora's prior spit-ups and vomits were never accompanied by the other symptoms she experienced on September 30, such as lethargy and trouble breathing. Further, Mead specifically told Detective Martinez that Ora's first projectile vomit was the "most vomit [he had] ever seen" and that Ora made strange cries and grunting noises that she had not ever made before. Mead knew, by his own admissions, that Ora's symptoms were not normal for her.

Additionally, Mead had information that made Ora's symptoms much more alarming, information that his wife did not have until after Ora was admitted to the hospital. According to his statement to police, Mead jerked Ora up by her leg, and her neck jerked, on Saturday night before she began showing symptoms on Sunday. The State's experts did not believe that incident caused Ora's serious injuries. The State's expert evidence indicated that Ora suffered abusive head trauma after her normal feeding on Sunday morning at 7:00 but before she became symptomatic at her feeding four to five hours later. Ora and Ophelia were alone with Mead during most of that

18

period. The jury could have inferred from Mead's belated admission and the State's expert testimony that he knew information triggering his duty to seek medical care for Ora by the time she began showing symptoms mid-day Sunday.

Mead contends that there is no evidence in the record that he wanted to delay medical treatment or tried to convince his wife to delay the treatment. However, Mother testified that when she was "freaking out" about the baby's condition, he told her, "it's okay, you have an appointment," referring to the scheduled doctor's appointment set for Monday at 1:00 p.m. Further, Dr. Coffman's encounter notes provide,

> Mom states last night [Sunday night] was when she got concerned and the baby looked pale. Mom states her husband kept saying the baby was fine and if she started being fussy then she would need to be seen. . . . Mom states that at 2:00 AM, [Mead] told her to go to sleep and he would watch the baby.

A few hours later, Mother showered, Mead bathed Ora, and he told Mother "to go ahead and take her" to the doctor.

Viewing the evidence in a light most favorable to the jury's verdict, we hold that a reasonable jury could have found that Mead knowingly failed to obtain medical care for Ora based on his specific knowledge that she had been injured (either under his version of the facts or the State's theory based on her symptoms and its expert testimony about those symptoms or some combination thereof) shortly before she began exhibiting concerning symptoms that were unlike her typical colic. We

19

therefore hold that the evidence is sufficient to support the jury's finding against Mead on the mental-state element of the offense.

## 2. Causation

Mead also contends that the evidence is insufficient to prove causation. That is, he contends that the State did not prove that the delay in medical care caused Ora's injury. Under Section 22.04 and the indictment in this case, the State was required to prove that Ora suffered serious bodily injury because of Mead's failure to provide timely medical care. Tex. Penal Code Ann. § 22.04(a)(1); *Payton*, 106 S.W.3d at 329. Mead asserts that Dr. Hansen told the jury that the delay in medical care had no effect on Ora's condition.

Although Dr. Hansen explained that because of the global nature of Ora's brain injury, he would have been unable to help her surgically and conceded that had she arrived at the hospital two or three hours earlier, her outcome would probably have been the same, he could not say whether her outcome would have been different had she arrived twelve hours earlier. He opined that she should have received medical care much sooner, especially because she was symptomatic for twenty-four hours before her parents sought treatment. He also stated that her injuries were exacerbated by the delay of care.

Moreover, Dr. Coffman testified that she believed that Ora's health deteriorated from the time she became symptomatic until she arrived at the hospital and that her state worsened without timely medical care. Although Dr. Coffman

20

admitted that it was "impossible to know for sure" whether the delay of medical treatment caused greater injuries, she also testified, in response to the prosecutor's questions, about how prompt medical care could have helped Ora:

> Q. Why is it important in this instance to get immediate medical care?
>
> A. Well, with immediate medical care, you can do things to reduce the brain swelling. You can make sure they're oxygenated well, to make sure there's not more injury to the brain from lack of oxygen. And you can treat symptomatically just to make sure profusion is good. I mean, the whole thing. Make sure she's breathing well and reduce any further harm to the brain.
>
> Q. Okay. And am I correct that in your testimony, you talked about some of the injuries being due to lack of oxygen?
>
> A. It looked like it on MRI, yes.

Dr. Coffman testified that without treatment, Ora would have died.

This evidence was sufficient to support the jury's finding on causation. The jury was free to believe all, some, or none of the evidence it received. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Stringer v. State*, Nos. 02-19-00042-CR, 02-19-00043-CR, 02-19-00044-CR, 02-19-00045-CR, 2020 WL 938150, at *3 (Tex. App.—Fort Worth Feb. 27, 2020, pet. ref'd) (mem. op., not designated for publication). Therefore, from Dr. Hansen's testimony that the delay in medical care exacerbated Ora's injuries and from Dr. Coffman's testimony that prompt care could have prevented further brain injury due to a lack of oxygen, the jury could have properly inferred that Mead's failure to get Ora timely medical treatment caused further brain injury by depriving her brain of oxygen. *See Saenz v. State*, No. 01-18-

00896-CR, 2020 WL 3525449, at *8 (Tex. App.—Houston [1st Dist.] June 30, 2020, no pet.) (mem. op., not designated for publication) (holding jury could have reasonably inferred causation of child's serious bodily injury from defendant's failure to seek medical care from doctor's testimony that blood accumulated in pericardial sac caused child's death but could have been extracted with needle or in surgery).

### 3. Resolution

Sufficient evidence supports the challenged jury findings on the requisite mental state and causation. Applying the appropriate standard of review to all the evidence, we hold that the evidence is sufficient to support Mead's conviction of injury to a child by omission. We overrule his third issue.

### C: Count Three: Aggravated Assault of a Family Member

In the third count, Mead was charged with aggravated assault of a family member. *See* Tex. Penal Code. Ann. § 22.02(a)(1), (b)(1). A person commits the offense, as charged in the indictment, if he commits an assault using a deadly weapon and thereby causes serious bodily injury to a family member. *Id.* § 22.02(a)(1), (b)(1), *see id.* § 22.01(a)(1). A person commits an assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 22.01(a)(1). The offense is a felony in the first degree if, as charged here, the complainant is a member of the defendant's family, and a deadly weapon is used. *Id.* § 22.02(b)(1).

Some elements are not at issue. It is undisputed that Ora, as Mead's daughter, is a member of his family. *See id.*; *see also* Tex. Fam. Code Ann. § 71.003. As explained

22

above, it is also undisputed that Ora's injuries, including severe brain swelling and bleeding that resulted in permanent brain damage, qualify as serious bodily injury. *See* Tex. Penal Code Ann. §§ 1.07(a)(46), 22.02(a)(1). Additionally, Mead does not dispute that his hand qualified as a deadly weapon. *See id.* §§ 1.07(a)(17)(B), 22.02(b)(1).

Mead has two distinct challenges to the sufficiency of the evidence for his aggravated-assault conviction. First, he contends that the State failed to prove the manner and means of the assault as alleged in the indictment. Second, he contends that the State failed to prove that he recklessly caused the injuries to Ora.

### 1. Manner and Means

The indictment alleged that Mead caused serious bodily injury to Ora by "shaking her or jerking her with his hand or by hitting her against a soft or hard object." Relying on *Castillo v. State*, 7 S.W.3d 253 (Tex. App.—Austin 1999, pet. ref'd), Mead argues that the State failed to prove the specific manner and means that was pled in the original indictment.[6] We hold that the evidence is sufficient to support the finding that Mead assaulted Ora as alleged in the indictment.

First, "the manner[s] and means of injuries alleged in an assault case are not an essential element of the offense and therefore are not included within the hypothetically correct jury charge, and thus they are not challengeable under a sufficiency-of-the-evidence review." *Sanivarapu v. State*, No. 02-16-00416-CR,

---

[6]"Manner and means" describes how the defendant committed the criminal act alleged in the indictment. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005).

2018 WL 3580878, at \*7 (Tex. App.—Fort Worth July 26, 2018, pet. ref'd) (mem. op. on reh'g, not designated for publication) (cleaned up); *see also Hernandez v. State*, 556 S.W.3d 308, 316 (Tex. Crim. App. 2017); *Bin Fang v. State*, 544 S.W.3d 923, 929 (Tex. App.—Houston [14th Dist.] 2018, no pet.). To the extent *Castillo* can be read to hold that a variance between an alleged manner and means and an actual manner and means precludes an assault conviction, we once again decline to follow it. *See Gray v. State*, No. 02-14-00249-CR, 2015 WL 6081668, at \*5 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op., not designated for publication).

Second, even if the manner and means were challengeable in a sufficiency review in assault cases, *Castillo* is distinguishable from this case. Castillo was convicted for unindicted actions not supported by the evidence. As we explained in *Gray*,

> In *Castillo,* the defendant was indicted for intentionally and knowingly causing serious bodily injury to a child. 7 S.W.3d at 254. The indictment specifically alleged that the defendant either struck the child with his hands or struck the child's head against a wall or a floor. *Id.* at 255. The evidence at trial, however, demonstrated that the victim's injuries were characteristic of a child who had been "shaken back and forth at a very rapid rate of speed." *Id.* at 256. Notably, the child did not have any evidence of skin bruising or swelling but only injuries consistent with a deceleration-type injury. *Id.* The State's doctor testified that the child's "injuries were totally consistent with a shaking-type injury and found no evidence that his head actually hit an object." *Id.* The court of appeals reversed the defendant's conviction and ordered an acquittal, holding that the evidence was legally insufficient to support a conviction for "recklessly injuring a child by striking." *Id.* at 262.

2015 WL 6081668, at \*4. Mead was not indicted for only shaking or hitting Ora against a surface; he was also indicted for jerking her with his hand, an unchallenged

24

allegation that the evidence sufficiently supports, as we detail below. *See Gray*, 2015 WL 6081668, at *5 (distinguishing *Castillo* because Gray, unlike Castillo, was charged with an alternative manner and means supported by the evidence).

Considering the alleged manners and means or not, we hold that the evidence sufficiently proves that Mead caused serious bodily injury to Ora as alleged in the indictment. The entire Cook Children's multidisciplinary team treating Ora concluded that she had suffered abusive head trauma. Dr. Coffman testified that Ora suffered abusive head trauma that could have been caused by a violent shake, jerk, or hit or a combination of all three. According to Dr. Coffman, Mead's report about Ophelia's pulling Ora off the bed Saturday night and his grabbing the infant by the leg and jerking her onto his shoulder while he was still reclining reaffirmed the diagnosis, even though the doctor did not believe the injuries happened in the way Mead described. Dr. Coffman testified that Mead's story was not consistent with Ora's injuries because

- The movements were not "forceful enough";

- Ora "was fine afterwards"; and

- Ora "slept fine" and "ate fine after that event."

Dr. Coffman testified that Ora would not have been able to eat normally after suffering abusive head trauma. Dr. Coffman stated that Mother "was very clear that at 7 a.m." on Sunday morning, before Mother left the girls with Mead, Ora "ate and fed normally."

25

Dr. Hunt testified that Ora's eye injuries were consistent with nonaccidental trauma. He stated that the diffuse retinal hemorrhages found only in Ora's right eye were consistent with a forceful movement, such as shaking or fast acceleration or deceleration, toward her right side or direct trauma to her right side. Direct trauma can be "blunt trauma[,] where that side of the head is hit against something[,]" or trauma caused by shaking or rapid acceleration and then rapid deceleration or stopping quickly.

Dr. Hansen testified that all of the findings pointed to abuse. Specifically, he said that Ora's neck ligaments could have only been caused by "a violent flexion of the neck forward." Based on his training and experience, he described Ora's injuries as "[v]ery violent" and inflicted abusive head trauma. He answered "Yes" when asked whether Ora's injuries could have been caused by a violent shake, jerk, or hit.

Finally, Mead told the detective that he had jerked Ora up to his chest and had felt her neck jerk when he pulled her.

Mead attempted to refute the State's evidence by presenting evidence from his own experts. Dr. Scheller testified that he believed the cause of Ora's injuries was a stroke in a brain vein that triggered seizures, causing a blood flow issue in her brain. The main reason Dr. Scheller did not think Ora's injuries were caused by inflicted trauma was the absence of outside evidence of a beating. Similarly, Professor Rast testified that she did not believe that Ora's injuries were caused by shaking, jerking, or

26

hitting because there were no bruises on Ora's torso and because she had no broken bones.

However, the State's experts testified that it is not unusual for a child to have no broken bones in these types of cases. Dr. Hansen explained that a baby's bones have the ability to deflect more than an adult's bones, so the baby's bones do not break as frequently. Further, Dr. Hansen explained that skull fractures are more common in accidents than in cases of inflicted trauma. Mead's expert, Professor Rast, even acknowledged that infant skulls are softer and do not fracture as easily as adult skulls, and that fractures are more common in accidents.

As explained above, the factfinder alone judges the weight of the evidence and the credibility of the witnesses. *Queeman*, 520 S.W.3d at 622. When presented with conflicting testimony, it is the factfinder's duty to resolve the differences. *Matson*, 819 S.W.2d at 846. With respect to the verdict, the jury in the present case resolved the conflicting testimony in favor of the State. *See id.* Viewing the evidence in the light most favorable to the verdict, we hold that the evidence sufficiently supports the jury's verdict that Mead caused Ora's serious bodily injury as alleged in the indictment. *See Queeman*, 520 S.W.3d at 622; *Matson*, 819 S.W.2d at 846; *see also Gray*, 2015 WL 6081668, at *5.

## 2. Mens Rea

In the indictment, Mead was charged with "intentionally or knowingly or recklessly" causing serious bodily injury to Ora.[7] Mead argues that the State failed to prove that he acted recklessly when causing serious bodily injury to Ora.

As explained, a person commits aggravated assault if he intentionally, knowingly, or recklessly causes serious bodily injury to another. Tex. Penal Code Ann. §§ 22.01(a)(1), 22.02(a)(1). Aggravated assault based on injury is a result-oriented offense. *Landrian v. State*, 268 S.W.3d 532, 537 (Tex. Crim. App. 2008). To review, a person acts intentionally when he consciously wants to cause the result, and a person acts knowingly when he is cognizant that his actions are reasonably certain to cause

---

[7]Mead asserts that the only effective difference between Count One, intentionally or knowingly causing serious bodily injury to a child (on which he was acquitted), and Count Three, intentionally, knowingly, or recklessly causing serious bodily injury to a family member (on which he was convicted), is the lesser mens rea of "recklessly" that is available for Count Three. "[I]f a defendant is acquitted of one count and convicted of another based on the same evidence in a single trial, the defendant cannot rely on the inconsistent verdicts to attack [his] conviction." *Hernandez*, 556 S.W.3d at 331 (Richardson, J., concurring); *see also United States v. Powell*, 469 U.S. 57, 68–69, 105 S. Ct. 471, 478–79 (1984); *Dunn v. United States*, 284 U.S. 390, 393, 52 S. Ct. 189, 190 (1932), *overruled on other grounds by Sealfon v. United States*, 332 U.S. 575, 68 S. Ct. 237 (1948); *Baker v. State*, No. 02-17-00193-CR, 2020 WL 1808292, at *4 (Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (mem. op., not designated for publication); *Silva v. State*, No. 02-18-00155-CR, 2018 WL 2986901, at *3 (Tex. App.—Fort Worth June 14, 2018, pet. ref'd) (per curiam) (mem. op., not designated for publication). Thus, Mead's acquittal of intentionally or knowingly causing serious bodily injury to a child has no bearing on our sufficiency analysis of the evidence supporting his convictions.

the result. Tex. Penal Code Ann. § 6.03(a), (b). To be reckless regarding the result of

his conduct, a person must be

> aware of but consciously disregard[] a substantial and unjustifiable risk
> that . . . the result will occur. The risk must be of such a nature and
> degree that its disregard constitutes a gross deviation from the standard
> of care that an ordinary person would exercise under all the
> circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(c). When reviewing a finding that a defendant was reckless, appellate courts

must assess the evidence of defendant's conduct to decide if:

(1)     the alleged act or omission, viewed objectively at the time of its
        commission, created a "substantial and unjustifiable" risk of the
        type of harm that occurred;

(2)     that risk was of such a magnitude that disregard of it constituted a
        gross deviation from the standard of care that a reasonable person
        would have exercised in the same situation . . . [;]

(3)     the defendant was consciously aware of that "substantial and
        unjustifiable" risk at the time of the conduct; and

(4)     the defendant consciously disregarded that risk.

*Williams*, 235 S.W.3d at 755–56. The State does not need to prove the defendant's

awareness of a specific risk in order to establish that the defendant's act involved a

substantial and unjustifiable risk. *See Assavedo v. State*, Nos. 05-15-00480-CR, 05-15-

00481-CR, 2016 WL 4123690, at *5 (Tex. App.—Dallas July 29, 2016, no pet.) (mem.

op., not designated for publication) ("The evidence shows that, in his manner of

driving, appellant created a substantial and unjustifiable risk and consciously

disregarded the risk he created. Appellant did not need to be aware that there was a

specific risk of imminent danger to a child in the vehicle."); *Trepanier v. State*,

940 S.W.2d 827, 829 (Tex. App.—Austin 1997, pet. ref'd) ("A defendant need not be aware of the specific risk of another's death in order to commit manslaughter."). A defendant's mental state may be inferred from circumstantial evidence. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). It may also be inferred from the extent of the injuries and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

In determining whether Mead's conduct was reckless, the jury was entitled to consider the extent of Ora's injuries, her size and strength compared to Mead's, the method used to produce the injuries, and the testimony from several doctors that inflicted trauma was the cause of her injuries. *See id.*, 906 S.W.2d at 487; *Kelley v. State*, 187 S.W.3d 761, 764 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Dr. Coffman testified that at only four weeks old, Ora could not have caused these injuries herself, and the doctors discounted toddler Ophelia's ability to cause them based on the parents' testimony of how she handled the baby. Dr. Coffman testified that the force necessary to cause Ora's injuries would have been similar to the type of rapid acceleration/deceleration seen in car accidents and that such force can be caused by violent shaking or impact.

Because of the sudden onset of symptoms and Ora's rapid decline, the doctors believed that the traumatic event must have happened on Sunday morning, sometime between the 7 a.m. feeding and the lunchtime feeding, when Ora projectile vomited for the first time that weekend. There was no testimony that Mother was alone with

30

Ora any time between Ora's breakfast and the onset of her symptoms. Mead was alone with the baby and Ophelia during that time.

Mead admitted in his interview with Detective Martinez that he had quickly jerked Ora on Saturday night and did not immediately tell Mother about the incident because he "didn't want to [freak] her out." Mead repeatedly stated during his police interview that he "did this" and that he was responsible for what happened but that it had not been on purpose. The jury was free to believe all, none, or part of Mead's statements to law enforcement. *See Day v. State*, 614 S.W.3d 121, 127 (Tex. Crim. App. 2020).

The jury could have found Mead's changing story significant. He did not admit to jerking Ora to his chest and noticing her neck jerking on Saturday night until Tuesday, the day after she was admitted to Cook Children's. At first, he attempted to cast blame on his toddler. The jury could have found Mead's changing stories indicated a consciousness of guilt. *See Gray*, 2015 WL 6081668, at *4.

Based on the severity of Ora's injuries, the traumatic nature of the injuries, and the evidence that the injuries occurred while Ora was in Mead's care, a rational jury could have concluded beyond a reasonable doubt that Mead acted recklessly when he caused serious bodily injury to Ora. *See Kelley*, 187 S.W.3d at 764.

We hold that the evidence is sufficient to support, at minimum, the jury's finding of recklessness.

### 3. Resolution

Sufficient evidence supports the challenged jury findings on Mead's mental state and causation. Manners and means are not elements of assault and therefore not part of a sufficiency analysis; even so, the evidence sufficiently proves that Mead recklessly assaulted Ora, his daughter, as alleged in the indictment, causing serious bodily injury, and that he used a deadly weapon, his hand, to do so. We overrule Mead's fourth issue.

### III. Limits on Mead's Expert Witnesses' Testimony

In Mead's first issue, he argues that the trial court erroneously limited the testimony of his two expert witnesses: Dr. Scheller and Professor Rast.

### A. Standard of Review

We review evidentiary rulings, including those regarding expert testimony and demonstrative exhibits, for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Simmons v. State*, 622 S.W.2d 111, 113 (Tex. Crim. App. 1981). We will not reverse an evidentiary ruling unless it is outside the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g). If the ruling is correct under any applicable theory of law, we will affirm it regardless of the trial court's reason for the ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

## B. Substantive Law

As we have recently explained,

> Rule 702 of the Texas Rules of Evidence governs the admissibility of expert testimony. That rule allows a witness who is "qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion or otherwise if [her] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Hence, three conditions must be met before expert testimony is admitted: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the testimony's subject matter is appropriate for expert testimony; and (3) admitting the expert testimony will aid the factfinder in deciding the case. *Rhomer*, 569 S.W.3d at 669. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.*

*James v. State*, 623 S.W.3d 533, 552 (Tex. App.—Fort Worth 2021, no pet.). Rule 705(b) allows the party opposing the expert evidence to test the bases of the expert's opinion in a hearing outside the jury's presence. Tex. R. Evid. 705(b); *Jenkins v. State*, 912 S.W.2d 793, 813 (Tex. Crim. App. 1995) (op. on reh'g). "The trial judge thus functions as a gatekeeper to determine the reliability, relevancy, and admissibility of scientific evidence." *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020); *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006).

## C. Dr. Scheller's Demonstrative Exhibit and Related Testimony

During his Rule 705 hearing, Dr. Scheller explained to the trial court that he intended to use a demonstrative exhibit containing an image of retinal hemorrhage caused by blockage in a retinal vein, which Ora did not have, to support his opinion that instead of abusive head trauma causing Ora's retinal hemorrhage, a blockage in

the venous system—a stroke—within her brain traveled toward the eye to ultimately cause the retinal hemorrhage. Mead's defense counsel made clear that the image would not be offered as evidence. The trial court ruled that the image and related testimony could not be presented to the jury because the image was not relevant, it was confusing, and seeing an image of something that did not occur in this case would not be helpful to the jury. Mead did not ensure that a copy of the excluded image was included in the record.

Mead argues that the trial court abused its discretion by excluding the image showing retinal hemorrhage and Dr. Scheller's testimony about it because the image and related testimony rebutted the State's evidence that Ora's retinal hemorrhaging indicated abusive head trauma. The State argues that Mead did not properly preserve error, that the image of retinal hemorrhage and related testimony were not relevant, and that any error would be harmless.

### 1. Preserved Error

Even though the excluded demonstrative image was not offered into evidence, the same preservation rules apply to Mead's complaint that apply to evidentiary complaints. *See, e.g.*, *Graham v. State*, 3 S.W.3d 272, 284 (Tex. App.—Fort Worth 1999, pet. ref'd) (overruling appellant's complaint that party to murder was not brought to his trial to serve as a demonstration model when the record contained no bill of exceptions and no evidence that she was willing to cooperate, that her demonstration would have been relevant, or that it would have helped appellant or the jury). To

34

preserve error when a trial court excludes evidence, a party must show the substance of the excluded evidence by offer of proof unless the substance is apparent from the context of the questions asked. Tex. R. App. P. 33.2; Tex. R. Evid. 103(a)(2); *Golliday v. State*, 560 S.W.3d 664, 670–71 (Tex. Crim. App. 2018); *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009). A party may make an offer of proof in question-and-answer form or in the form of a concise statement by counsel. Tex. R. Evid. 103(c); *Holmes*, 323 S.W.3d at 168. If the latter, counsel must also concisely summarize the evidence offered and—if not apparent—explain its relevance. *Holmes*, 323 S.W.3d at 168. In the case of photographs, the photographs can be offered. *See Riley v. State*, No. 06-10-00130-CR, 2012 WL 5866651, at *2 (Tex. App.—Texarkana Nov. 20, 2012, no pet.) (mem. op.) (holding the untimely offer of proof of the photographs after the jury began deliberations presented nothing for review). An inadequate offer of proof does not preserve error. *Holmes*, 323 S.W.3d at 171; *see also Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (holding that error was not preserved when defendant failed to proffer with some degree of specificity the substantive evidence he intended to present).

The image proffered by Mead was not included in the record, so this court has no way to review it. To determine if Mead has preserved error, we must consider if he sufficiently explained the image and its relevance. *See Holmes*, 323 S.W.3d at 168; *see also Montgomery v. State*, 383 S.W.3d 722, 727 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Dr. Scheller described the image during the Rule 705 hearing:

The image on the left is a diagram of a side view of—a cut-away view of a normal eyeball showing arteries and veins. And I'm going to explain what those are.

*And then immediately next to that, where we see the little red dots, that's an example of what a retinal hemorrhage looks like caused by a different cause, not by the cause of [Ora], but shown so that people understand the principles of what causes retinal hemorrhage.*

*And so we're talking about this little blood clot that you can see approximately at 8:00—approximately at 8:00 in collecting things. So when this gets blocked, that causes retinal hemorrhage.*

*And then I will go on to explain that in [Ora]'s case, there was no blockage in that vein directly behind the eye,* but that vein does drain into the main venous system of the brain, and there was blockage and . . . in the MRI there was blockage in the venous system within the brain. That blockage can then go backwards and cause blockage in the retinal veins. And rather than attributing her retinal hemorrhage to trauma or abuse, we can attribute it to a blockage of circulation. [Emphasis added.]

The State objected to the second image in the demonstrative exhibit, stating that it showed an occluded central retinal vein, and that because Ora did not have that, the image was not relevant and was more prejudicial than probative. Defense counsel replied, "[S]o there is a complete understanding to this jury of what happened and what did not occur, he is showing them the second one to say that did not occur and, if it had occurred, this would be the result. It's just to simply make it easier for the jury to understand."

Without the actual image in the record, we cannot compare it to the images of Ora's retinal hemorrhaging that do appear in the record. However, Dr. Scheller presented a sufficient verbal description of the excluded image to allow us to conclude

36

that Mead preserved error. *See Jackson v. State*, 352 S.W.3d 288, 295 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

## 2. No Relevance

The trial court did not abuse its discretion by excluding the image and related testimony because they were not relevant. "[D]emonstrations and demonstrative aids do not have independent probative value for determining the substantive issues in the case; instead, they are relevant in theory only because of the assistance they give to the trier in understanding other real, testimonial and documentary evidence." *Milton v. State*, 572 S.W.3d 234, 240–41 (Tex. Crim. App. 2019) (internal quotation marks and citation omitted).

As the trial court pointed out, the jury's viewing a demonstrative exhibit of something that neither party alleged Ora had—retinal hemorrhaging caused by a retinal vein blockage—would only add confusion. Given that the case was already steeped in medical testimony and medical exhibits pertinent to Ora's injuries, we cannot conclude that the trial court abused its discretion by excluding an image of someone else's eye with an injury caused by a retinal blockage that the parties agreed Ora did not have.

## 3. No Harm

In an abundance of caution, we point out that even if the trial court had abused its discretion by excluding the demonstrative image and testimony about it, any error would have been harmless. Because Mead does not allege constitutional error, we

apply Rule 44.2(b). Tex. R. App. P. 44.2(b). That Rule requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. *Id.* An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In determining the likelihood that a nonconstitutional error adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

Dr. Scheller testified before the jury about his theory of the cause of Ora's retinal hemorrhaging and showed the jury the image of the normal eye that the trial court allowed him to use as a demonstrative exhibit:

Q.    Okay. Can you tell us what . . . a[n] angiogram is?

A.    Sure. When—radiologists are able to get a look at the blood vessels of any organ, and that means the arteries and the veins, using both CAT scan and MRI. And so it's a common test when people have problems with a particular organ. Hey, let's look at the blood vessels and see if those are normal.

Q.    Okay. Was that used?

A.    So O[ra], on the 1st . . . had an angiogram done with the MRI machine looking at the arteries of her brain, but not at the veins of her brain.

Q.    Okay. And so why . . . would there have been retinal hemorrhaging?

A.    Whenever there's a circulation problem in or around the brain, then that can affect the eyes indirectly because the eye circulation is very much connected with the brain circulation. And I'm happy to show a demonstrative so the Court can understand.

      . . . .

      The image I'm showing the Court is a diagram from Google images of what a side cutaway view of the eye would look like.

      At 8:00, we see a yellow thing, which is the optic nerve, which is going to relay the . . . light messages the eye gets to the brain.

      Within the optic nerve is a blood vessel bringing blood to the eye—that's the red thing that's unmarked—and [a] blood vessel taking the blood back to the heart. That is labeled as the central retinal vein.

      That central retinal vein is receiving blood from all those little blue tributaries that you see in the eyeball that are collecting the used blood, and their job is to deliver it to the heart.

39

> A retinal hemorrhage is when there's a drop or 50 drops or a hundred drops of blood next to a vein that has leaked out of a vein. So that's what O[ra] was found to have.

When asked to "put it all together as to what . . . happened to O[ra's] brain," Dr. Scheller answered,

> I believe that she suffered a very small stroke, which is a blockage in a blood vessel on the surface of the brain that happened to be in a small brain vein.
>
> Sadly, that stroke triggered seizures that were not recognized by her caregivers. Seizures in infants are very often not apparent because babies don't flop like older people do when we have seizures.
>
> That seizure triggered a problem of blood flow to her brain so only the middle part of her brain was getting blood flow and not the periphery.
>
> That—the blockage in the blood vessel triggered a small subdural hematoma, that blood clot that we saw in-between the brain and the inside of the skull. And the blockage in the venous system in the brain triggered the retinal hemorrhages. Again, the eye veins are directly connected to the brain veins.

Dr. Scheller adequately conveyed his opinion as to the causation of Ora's retinal hemorrhaging to the jury without the excluded demonstrative image and the testimony about it. We therefore conclude that even if the trial court had abused its discretion by excluding the demonstrative image and the testimony about it, such error would have been harmless. *See* Tex. R. App. P. 44.2(b); Tex. R. Evid. 103(a); *Mosley v. State*, 983 S.W.2d 249, 258 (Tex. Crim. App. 1998) (op. on reh'g); *Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981); *Cooper v. State*, No. 02-14-00202-CR, 2015 WL 1407850, at *7 (Tex. App.—Fort Worth Mar. 26, 2015, no pet.)

(mem. op., not designated for publication); *Watrous v. State*, Nos. 02-11-00168-CR, 02-11-00169-CR, 02-11-00170-CR, 2012 WL 2428528, at *8 (Tex. App.—Fort Worth June 28, 2012, pet. ref'd) (mem. op., not designated for publication). We overrule this portion of Mead's first issue.

### D. Professor Rast's Testimony About C-Collars

Ora was placed in a C-collar at Cook Children's. Professor Rast explained during her Rule 705 hearing that since Ora's injury, Fort Worth EMS has stopped using C-collars on patients with brain injuries before they are hospitalized because of the risk that the C-collars could exacerbate the brain injuries. The State objected to Professor Rast's "talking about any of the C-collar information" on the grounds that she had no experience with C-collars and did not "state any underlying evidence that . . . there was any injury caused to O[ra] as far as the C-collar." When subsequently pressed by the trial court, Professor Rast could not draw any specific conclusions regarding whether the C-collar had "anything to do with" Ora's injuries. The trial court therefore excluded Professor Rast's testimony about the C-collar.

In the remainder of his first issue, Mead contends that Professor Rast's testimony about the potential dangers of C-collars and the discontinued use of C-Collars by EMS is both relevant and reliable. He argues that the testimony is relevant because it rebuts the State's proffered testimony that the ligament injuries in Ora's neck were caused by abuse, when the injuries may have resulted from using the C-

41

collar. The State asserts that Mead forfeited any objection and that the trial court properly excluded Professor Rast's testimony because it was not relevant.

## 1. Abandoned at Trial

After the trial court sustained the State's objection and excluded Professor Rast's testimony about C-collars, defense counsel responded: "I do realize and expect the Court may bring some limitations. For example, certainly, the C-collar, we understand." The C-collar was not discussed again in the hearing or before the close of evidence.

Mead gave the trial court the impression that he was abandoning the C-collar line of questioning in examining Professor Rast. We therefore hold that he forfeited the issue for appellate review. *See* Tex. R. App. P. 33.1; *Purtell v. State*, 761 S.W.2d 360, 366 (Tex. Crim. App. 1988) (holding that "when appellant elicited an unfavorable and unequivocal answer to his final question and then told the trial judge that he had nothing further," he "created the distinct impression that he was abandoning his opposition" and "the trial judge did not know that he was to rule on a *contested* point"); *Braswell v. State*, No. 05-96-01275-CR, 1998 WL 420316, at *3–5 (Tex. App.—Dallas July 28, 1998, pet. ref'd) (not designated for publication) (holding appellant's complaint that the trial court had limited his cross-examination about an affidavit of nonprosecution forfeited because after the trial court denied the cross-examination, appellant stated, "I'm not interested in the affidavit," and indicated that he wanted to examine the witness about another matter); *Ramos v. State*, 819 S.W.2d 939, 943 (Tex.

App.—Corpus Christi–1991, pet. ref'd) (holding appellant's jury shuffle complaint forfeited when appellant initially acquiesced to the trial court's decision to hold a later shuffle but later declined that shuffle). We overrule the remainder of Mead's first issue.

## IV. Prosecutor's References to Opinions of Cook Children's Neurosurgeons Who Did Not Testify

In his second issue, Mead argues that the trial court erroneously allowed the prosecutor to testify outside the record regarding the opinions of four[8] expert witnesses who did not testify at trial. Because evidence of all four pediatric neurosurgeons' opinions (including testifying pediatric neurosurgeon Dr. Hansen's) was in the record, we hold that the trial court did not abuse its discretion by allowing the question. Even if the trial court had erred, such error would be harmless because Mead failed to object to a later, similar question referencing the same content.

During the State's cross-examination of Dr. Scheller, the prosecutor brought in a box of what he characterized as 2700 pages of doctors' reports. Defense counsel objected: "Judge, I'm going to object. That's not in evidence. We haven't looked at it. We don't know what it is. It's a box of books. I'd like to be able to exam[ine] it. We don't know what he's talking about." The prosecutor replied that he would happily "allow defense [counsel] or the witness to exam[ine] those records." The trial court asked Dr. Scheller, "Would you like to examine them, sir?" Dr. Scheller declined:

---

[8]One of the four neurosurgeons, Dr. Hansen, did testify at trial.

43

"No, I trust—" The trial court then stated, "All right. Proceed." Mead lodged no further objection to the use of the medical records. Dr. Scheller conceded that in his prior review of the medical records, he had not seen any evidence that any Cook Children's doctor agreed with his diagnosis.

Shortly afterward, the following exchange occurred between the prosecutor and Dr. Scheller:

> Q.    . . . . [W]ould you disagree that there is a small community of pediatric neurosurgeons?
>
> A.    In the country? Oh, sure.
>
> Q.    Yeah. No more than 200. Would you disagree with that?
>
> A.    I'll just say a few hundred. Yeah, not too many.
>
> Q.    Just 20 in Tarrant County. Would you agree with that?
>
> A.    Take your word for it. I don't know.
>
> Q.    Okay. There's four at Cook's. Okay? At Cook Children's.
>
> A.    Okay.
>
> Q.    They all, by prior testimony, agree with the findings that are contained in the 2700 pages here. Do you disagree with those four neurosurgeons?

Defense counsel objected: "That has not come into evidence, that they all agree with whatever amount of pages. They have not testified." The prosecutor responded, "Dr. Hansen said that he reviewed this information with his colleagues, and that's what I'm referring to." Defense counsel replied that "it was not made clear who those colleagues were." The trial court overruled the objection, and Dr. Scheller answered,

44

"I have to take your word for it. I don't know that there were four neurosurgeons involved."

We review rulings on challenges to the content of cross-examination questions for an abuse of discretion. *See Brown v. State*, Nos. 05-09-00434-CR, 05-09-00435-CR, 2010 WL 2356100, at *8 (Tex. App.—Dallas June 14, 2010, pet. ref'd) (not designated for publication). It is improper to cross-examine a witness with a question that assumes a fact not in evidence. *Ramirez v. State*, 815 S.W.2d 636, 652 (Tex. Crim. App. 1991); *see Duncan v. State*, 95 S.W.3d 669, 673 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). However, when the question references a fact in evidence, a trial court does not abuse its discretion by overruling the objection and allowing the question. *See Philmon v. State*, 580 S.W.3d 377, 384 (Tex. App.—Houston [1st Dist.] 2019), *aff'd*, 609 S.W.3d 532 (Tex. Crim. App. 2020).

Before Dr. Scheller testified, Dr. Hansen testified that he had three pediatric neurosurgical colleagues and that they all agreed with his opinion in this case. Thus, the objected-to content of the prosecutor's question was already in evidence when the prosecutor asked the question. The trial court therefore did not abuse its discretion by allowing the question and admitting the resulting evidence. *See id.*

Even if the trial court had abused its discretion by allowing the question, the error would have been harmless because Mead failed to object to a similar follow-up question. Immediately after Dr. Scheller answered the question complained of, the cross-examination continued without further related objection:

45

Q.      ([BY PROSECUTOR]:) . . . . *And so . . . do you realize that your theory is contrary to the opinion of those four pediatric neurosurgeons?*

A.      I for sure know that it's contrary to one, but I can't say about the others. But if that's the case, that's fine. [Emphasis added.]

Generally, a party must object each time objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.). The rule is the same for objectionable questions. *See Holden v. State*, No. 2-03-454-CR, 2004 WL 2486020, at *2 (Tex. App.—Fort Worth Nov. 4, 2004, pet. ref'd) (mem. op., not designated for publication) ("Because Appellant failed to object to each question regarding [his wife]'s drug use, he has preserved nothing for appellate review."); *Smith v. State*, 88 S.W.3d 643, 651 n.4 (Tex. App.—Tyler 2000) ("If there was any error, it would have been harmless since essentially the same inquiry was made and answered."), *vacated on other grounds*, 61 S.W.3d 409 (Tex. Crim. App. 2001). We overrule Mead's second issue.

## V. Conclusion

Having overruled each of Mead's issues, we affirm the trial court's judgments.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 16, 2021