**Opinion issued December 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00630-CR

————————————

**CHADWELL SPENCER CALVERT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 89703-CR**

---

## MEMORANDUM OPINION

A jury found Chadwell Spencer Calvert guilty of two offenses: aggravated assault against a public servant and evading arrest or detention. On appeal, he raises three issues. First, Calvert argues that the trial court denied him the constitutional right to present a complete defense by excluding as irrelevant testimony about

whether he was under a physician's care for anxiety. Second, he argues the evidence is legally insufficient to show he used a deadly weapon. Third, he argues that the evidence is legally insufficient to show that he committed the evading offense.

We affirm.

## BACKGROUND

A grand jury issued a two-count indictment against Calvert that charged him with aggravated assault against a public servant and evading arrest or detention. On the assault, the indictment alleged that he intentionally, knowingly, or recklessly caused bodily injury to a peace officer with a deadly weapon, specifically, by stabbing the officer with a key or keys. As to the evasion charge, the indictment alleged that Calvert intentionally fled from the peace officer in a vehicle as part of the same criminal episode. The indictment included two enhancement paragraphs. The first alleged Calvert had previously been convicted of aggravated assault. The second alleged Calvert had also previously been convicted of evading arrest.

Calvert pleaded not guilty to both counts, which were tried to a jury.

The State's first witness was D. Schultz, who was a lieutenant with the Fort Bend County Sheriff's Office before his retirement. When not on duty, Schultz had a side job with a company that provides security for CenterPoint Energy. As part of this side job, Schultz was assigned to protect the utility provider's substations. In particular, he provided security at a substation newly built on County Road 831.

2

Schultz testified he twice encountered Calvert while working at this substation. The first encounter took place around 8:30 p.m. on February 11, 2020. While sitting in a marked patrol car, Calvert drove by the substation in a silver Ford Mustang "very slow, kind of stopped." Schultz activated his patrol car's lights to identify himself as law enforcement. Calvert then "stopped completely" and backed his Mustang in "towards the entrance to the substation." Calvert shined a flashlight at the patrol car, and Schultz responded by turning on his patrol car's spotlight, at which point Calvert backed up and pulled into the drive with his headlights facing Schultz. Schultz got out of his car to speak with Calvert and see what he wanted. Calvert leaned out of his car's window and asked what Schultz was doing there. Schultz told him he worked for the Sheriff's Office and was providing security. Schultz also told Calvert he was on private property and needed to leave, and Calvert responded that he was on county property. Nevertheless, Calvert departed.

The second encounter took place on February 27, 2020. When Schultz arrived for his shift around 7:00 p.m., the daytime security officer he was relieving informed him that a man in a silver Ford Mustang had been on the property and behaved in a "very challenging" manner. Schultz thought it sounded like Calvert. Around 9:30 p.m. that night, Calvert reappeared in his Mustang and pulled into the substation's driveway. When Calvert did so, Schultz's patrol car's lights were already activated. Schultz explained that he was supposed to keep his red and blue lights activated

3

while working there at night to deter trespassers (though he had not had them activated on the evening of his first encounter with Calvert). Schultz responded to Calvert's presence by pulling forward in his patrol car. But before he reached the Mustang, Calvert "backed out and sped off," departing the property.

After this second encounter, Schultz contacted the Brazoria County Sheriff's Office—because the substation was located in that county—and requested that the officer on duty assign "a close patrol" to the area. Schultz told the duty officer what had been happening and asked that "they keep an eye on the property" in response.

The State's next witness was C. Hutcherson, who was a corporal with the Lake Jackson Police Department at the time of trial. Like Schultz, Hutcherson had a side job working security for CenterPoint Energy at its substations. On March 6, 2020, Hutcherson was assigned to provide security at the County Road 831 substation.

Before this date, Hutcherson had received information about suspicious activity at this particular substation via "an app" that officers working side jobs use to communicate with one another. As a result, he was on the lookout for Calvert.

When Hutcherson arrived to relieve the daytime security officer, Calvert drove by the substation property in his Mustang. He drove slowly by flashing his headlights. Calvert also honked his horn and then left. Hutcherson thought Calvert's behavior was peculiar because there is nothing else there apart from the substation,

and Calvert's inexplicable behavior concerned him in terms of officer-safety, at least in part because Hutcherson had been told Calvert previously assaulted an officer.

At the time of the incident, Hutcherson was in attire indicating he was a peace officer. But unlike Schultz, Hutcherson was not using a marked police vehicle. His vehicle was, however, equipped with red and blue lights, like a police vehicle.

Given the prior encounters with Calvert, Hutcherson contacted local law enforcement after he drove by the substation. Deputy C. Mezzino of the Brazoria County Sheriff's Office came to the substation in response. When Mezzino arrived, he and Hutcherson "spoke briefly about what was going on," with Hutcherson "filling him in on the information" that Hutcherson had previously received.

As Hutcherson and Mezzino were talking, Calvert drove by again in the same fashion. At this point, Mezzino got back into his vehicle and pursued Calvert. Hutcherson remained at the substation, as he was not allowed to leave the property.

The State then called Deputy Mezzino to the stand. On March 6, 2020, he was in uniform and on patrol in a marked unit. He was dispatched to the County Road 831 substation. Upon arrival, he spoke with Hutcherson, who told Mezzino what he knew about Calvert. Mezzino testified that one of the things Hutcherson told him was that law enforcement had been alerted that Calvert wanted to kill cops.

As Mezzino was speaking with Hutcherson on the property about Calvert's most recent behavior, Calvert appeared, stopped his Mustang in the roadway, flashed his headlights, honked his horn, and revved his engine. Calvert then sped away.

In response, Mezzino got in his marked unit and pursued Calvert. Mezzino stated that both concern for Calvert's welfare and concern that Calvert reportedly desired to kill cops motivated the immediate pursuit, though Mezzino conceded that the mere desire to kill cops is not a basis for detaining someone. The speed limit on County Road 831 is 30 miles per hour, but Mezzino had to exceed 70 miles per hour to try to catch up with Calvert. Even at this speed, Mezzino did not close the gap.

Mezzino had activated the lights on his unit. But Calvert did not stop.

Mezzino finally caught up with Calvert near Calvert's residence, which is located on the same county road somewhat less than a mile from the substation. Calvert slowed down to turn into his driveway. This allowed Mezzino to catch up.

Calvert and Mezzino both pulled into the former's driveway. At this point Calvert rolled down his window and stated that he had not done anything, after which Calvert led Mezzino in further chase "around his yard, around his house, back out on the roadway, back down his driveway, and then back around his house again."

Calvert eventually stopped and exited from his Mustang, stating "I didn't do anything." Mezzino drew his sidearm and ordered Calvert to get on the ground. But

Calvert did not comply with Mezzino's order, so Mezzino holstered his sidearm and tried to arrest Calvert, who was uncooperative. A physical struggle ensued.

When Mezzino tried to gain control of Calvert to handcuff him, Calvert broke away. In response, Mezzino bear-hugged Calvert and took him to the ground. Afterward, Calvert was on his back, and Mezzino was on top of Calvert straddling his waist. Mezzino continued to try to gain control of Calvert, and Calvert continued to resist Mezzino's efforts to do so. During the struggle, Mezzino "felt stinging" on the top of his head, at which point he saw that Calvert "had car keys palmed in his hand, the pointy side down." Calvert then stabbed Mezzino with the keys near his left eye. Mezzino testified that Calvert came close to puncturing his eyeball, striking him right on the corner of the eye. Mezzino demonstrated for the jury how Calvert stabbed him, showing that Calvert wielded the keys in a downward-striking motion. Calvert also managed to strike Mezzino with the keys on his palm and forehead. Based on his training and experience as a peace officer, Mezzino opined that keys being used in this manner are capable of causing death or serious bodily injury.

Because Calvert was stabbing him, Mezzino stood up. Calvert did so too. Mezzino then took out his baton and struck Calvert in the knee. Calvert was undeterred and advanced while brandishing the keys. So, Mezzino struck Calvert in the forehead with his baton, which caused him to drop the keys but did not secure his surrender or cooperation. Calvert ran to the passenger side of his Mustang.

7

Thinking Calvert might be trying to get another weapon, Mezzino drew his sidearm and again told Calvert to get on the ground. Calvert fled on foot instead.

Mezzino lost sight of Calvert shortly afterward. Mezzino was winded, off balance, and in pain. His vision was "reduced from all the blood" from his eye.

Later, Calvert was found hiding in his attic and taken into custody.

Mezzino did not have a body-camera at the time, so there was no footage of the physical struggle. But his unit was equipped with a dashboard-camera. Parts of its footage was played for the jury, including the initial pursuit of the Mustang.

Another deputy, who arrived after the physical altercation, took photographs of Mezzino to document his injuries. These photographs were admitted into evidence. They show Mezzino with a bloody forehead wound as well as a substantial amount of blood streaming down his face from the outside corner of his left eye. These photographs also show Mezzino had a bloody puncture wound on one palm. Calvert inflicted all of these wounds on Mezzino by stabbing him with the keys.

Mezzino received medical treatment for his injuries at the scene from another deputy, which consisted of "an alcohol gauze cleanup." Later, an emergency medical technician provided further care of the same general nature but more thoroughly. Afterward, Mezzino drove himself to the emergency room, where personnel "cleaned the remaining blood up," glued the skin around his eye, and dressed his forehead wound with a skin-adhesive bandage. Mezzino also sought follow-up care

about a week later for blurry vision and pain behind his eye, and he was given eye drops and pain medication for these aftereffects. The blurriness and pain resolved about a week later or roughly two weeks after the physical altercation took place.

The State's final witness was S. Baker, a deputy with the Brazoria County Sheriff's Office. He arrived at the scene of the physical altercation after the fact. When Baker arrived, Mezzino "was bleeding pretty significantly from his face." Baker stated there was "a steady flow" of blood coming from the eye wound.

Baker was wearing a body-camera at the time, and his body-camera recorded his interaction with Mezzino. The footage from the body-camera was admitted into evidence. It corroborates Baker's testimony about Mezzino's bloodied condition.

Baker also testified that his interaction with Mezzino was unnatural. "He was very short in his answers and he seemed almost like he was disoriented." Mezzino's behavior at the scene made Baker concerned about the possibility of internal injuries.

Eventually, peace officers from multiple agencies arrived at the scene. They were given permission to search the house by its owner, Calvert's mother. Officers found Calvert hiding in the attic. He was arrested once he was coaxed out.

After the State rested, Calvert took the witness stand in his own defense.

Calvert testified that he previously had a problem with a vehicle idling on the substation property with its "high beams" on so that they were "shining down" the roadway, and the glare was getting in his face. This made him "mad." He explained

that the quality of the road combined with his poor vision made the road difficult enough to travel on without the additional nuisance of the vehicle's headlights.

Being mad, Calvert turned around and drove back to the substation, where he turned on his "high beams" and flashed the other vehicle to express his anger. In retrospect, Calvert testified, this "was ill-advised" and he wishes he had not done so.

After doing so, Calvert left and went home. But a day or two later, Calvert was driving by the substation and "flashed" his "high beams" in the same way again. On this second occasion, he interacted with a peace officer, who showed Calvert his badge. Once the officer did so, Calvert said he drove off the substation property.

Calvert denied he had any further interactions involving the substation before the evening that led to his arrest. On that evening, Calvert testified, he was driving to the gas station, somewhere around 6:30 or 7:00 p.m. It had not been dark long.

On the way to the gas station, Calvert remembered that he had forgotten his gas card. So, he backed into a neighbor's driveway to turn around and return home. At this point, he "saw a siren" coming down the street in his direction. Calvert heard the siren in addition to seeing the lights. But he did not know if it was a security guard from the substation, a peace officer, or an emergency vehicle. Calvert pulled out, and the vehicle with the siren then "just launched itself" at him and "slammed on the brakes" behind him. Calvert testified, "I thought it was going to hit me. I thought I was going to get injured or killed. I mean, it scared the devil out of me."

10

Calvert slowly drove back to his home and then pulled into his driveway. By this point, Calvert explained, he "was in panic" and "was scared" of his pursuer.

Defense counsel then asked whether Calvert was under a physician's care for anxiety, to which the State objected on relevance grounds. Defense counsel explained that he was trying to give the jury context as to why Calvert was upset to such an extent. However, the trial court sustained the State's relevance objection.

Calvert came to a stop, as did the other vehicle. By this point in time, Calvert apparently recognized that the other vehicle was a "cop car," as he described it. Calvert then drove off again, eventually returning home, where he stopped. He stated that the reason he stopped was because he ran into some brush or briars and the pursuing officer stopped right behind his car, effectively pinning his car in place.

Calvert next heard Deputy Mezzino yell at him to get out of the car and get on the ground. Calvert got out of the car, but he did not get on the ground. Instead, Calvert turned and began to walk away, and Mezzino "tackled" him to the ground.

Calvert landed on his back. Mezzino pinned him to the ground, with one knee on his chest and another on his shoulder. Mezzino "started beating" him and briefly "strangled" him as well. To stop the beating and the strangling, Calvert said he "reached up" with his key and "got him in the eye." He maintained he did so to try to keep from "getting beat to death" and that he "made one swipe with a key."

11

Calvert denied that he put up a struggle before the beating began. He said he could not struggle at that time because Mezzino had "just overpowered" him.

Once Calvert struck Mezzino in the eye with the key, Mezzino "jumped up off" him and took his "billy club" and hit Calvert across the eyebrow. The wound from this blow caused blood to start "spraying like a fountain" out of his face.

Calvert staggered back to his car and was screaming for his mother. He went into the house and hid in the attic. He gave himself up because he was "trapped."

Calvert acknowledged that he previously had been convicted of the felony offenses of aggravated assault with a deadly weapon and evading arrest in a motor vehicle. But Calvert denied that he had ever assaulted a public servant before, and he further denied that he had ever expressed a desire to kill any peace officers.

The defense then rested, and the parties presented closing arguments.

The jury found Calvert guilty of both of the charged offenses. The jury further found that both of the enhancement allegations were true and assessed his punishment at 35 years for the aggravated assault against a public servant and 25 years for evading arrest. Consistent with the jury's verdict, the trial court rendered a judgment of conviction on both counts, ordering the sentences to run concurrently.

Calvert appeals.

## DISCUSSION

### I.    Constitutional Right to Present a Defense

Citing the Sixth Amendment to the United States Constitution and several decisions of the United States Supreme Court, Calvert argues the trial court violated his right to present a defense by sustaining the State's relevance objection to his lawyer's question about whether he was under a physician's care for anxiety.

But Calvert did not make this constitutional complaint in the trial court. While he did argue this testimony was relevant, he did not assert that its exclusion constituted a deprivation of his constitutional right to present a defense. Therefore, Calvert has not preserved this issue for appellate review. *See* TEX. R. APP. P. 33.1(a) (providing that party must make complaint in trial court to present it on appeal); *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (holding complaints about constitutional right to present defense must be preserved in trial court); *Jackson v. State*, 352 S.W.3d 288, 295 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding appellant had preserved non-constitutional evidentiary arguments by raising these complaints in trial court but never argued in trial court that exclusion of evidence in question prevented him from presenting defense or violated due process and therefore had not preserved error with respect to constitutional issue).

We overrule Calvert's first issue.

## II.     Legal Sufficiency of the Evidence

### A.     Standard of review

In reviewing a jury's verdict for evidentiary sufficiency, we must uphold its verdict if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). The jury's verdict is irrational under this standard only if it is based on evidence that is not legally sufficient to support a conviction. *Id.* at 655–56; *see Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (stating appellate court's role is not to act as thirteenth juror but rather is confined to ensuring jury's verdict is a rational one that is based on more than mere modicum of evidence).

In a legal-sufficiency review, we consider all the admitted evidence and view it in the light most favorable to the verdict. *Harrell v. State*, 620 S.W.3d 910, 913–14 (Tex. Crim. App. 2021). This standard recognizes it is the jury's prerogative to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 914. So, we must defer to the jury's evaluation of the credibility of the witnesses and the weight to be given to various evidence. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013). The jury may draw inferences from the evidence so long as the

14

evidence supports each inference. *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021). When the evidence supports reasonable but conflicting inferences, we presume the jury resolved the conflict in favor of its verdict, and we defer to the jury's resolution of the conflicting inferences. *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). The jury is entitled to this deference because it may rely on common sense, common knowledge, personal experience, and observations from life when drawing inferences from the evidence. *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). However, the jury's verdict cannot rest on conjecture or speculation, which are mere theorizing or guessing about the possible meaning of the facts and evidence presented, as opposed to reasonable inferences that can be drawn from the evidence admitted at trial. *Anderson*, 416 S.W.3d at 888.

Each fact need not point directly and independently to guilt, so long as the cumulative force of all the incriminating circumstances suffices to support the jury's verdict. *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020). Thus, in our review, we must not use a divide-and-conquer strategy, evaluating individual bits of evidence in isolation, because this approach does not consider the cumulative force of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Nor does the evidence need to negate every conceivable alternative to the defendant's guilt to be sufficient. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022).

The law does not require a particular type of evidence. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). Direct and circumstantial evidence are equally probative. *Id.* Circumstantial evidence alone can be legally sufficient. *Id.* We apply the same standard of review with respect to both direct and circumstantial evidence. *Hammack v. State*, 622 S.W.3d 910, 915 (Tex. Crim. App. 2021).

Finally, we reiterate that legal-sufficiency review turns on the evidence the jury saw and heard. *Harrell*, 620 S.W.3d at 913–14. Evidence that conceivably could have been admitted, but was not, does not impact the sufficiency of the evidence that was admitted. *See Murray*, 457 S.W.3d at 449–50 (holding lower appellate court erred in focusing on evidence that was not admitted at trial in its legal-sufficiency review). Nor do we compare the record in this case with the records in others to ensure that particular evidence admitted in other trials is not missing. *Id.*; *Ledford v. State*, 649 S.W.3d 731, 742 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

### B.    Car keys as a deadly weapon

Calvert argues the evidence is legally insufficient to show he used a deadly weapon in his assault on Deputy Mezzino. Calvert maintains the sole evidence indicating the keys he used to stab Mezzino constitute a deadly weapon consists of Mezzino's conclusory testimony that a key is capable of causing death or serious bodily injury. Missing from the record, Calvert continues, is any evidence of the dimensions of the keys, the manner in which Calvert used them, or the depth of

Mezzino's wounds. Calvert further argues that the evidence does not show he stabbed Mezzino in the eye with the keys or that the keys caused the eye injury.

## 1. Applicable law

In general, a person commits the offense of aggravated assault if he commits an assault and either causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE § 22.02(a); *see also id.* § 22.02(b)(2)(B) (elevating aggravated assault from a second-degree to a first-degree felony when person commits it against another whom he knows is a public servant while the public servant is lawfully discharging an official duty).

"Deadly weapon" is statutorily defined as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17). "Serious bodily injury," in turn, is statutorily defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

Thus, the dispositive issue in this instance is whether the evidence is legally sufficient to show beyond a reasonable doubt that the keys Calvert wielded as a weapon were capable of causing serious death, permanent disfigurement, or protracted loss or impairment of Mezzino's eye. *See Tucker v. State*, 274 S.W.3d

17

688, 691 (Tex. Crim. App. 2008) (explaining that a key is not a deadly weapon by design and that the dispositive issue is whether the use or intended use of such an item is capable of causing death or serious bodily injury, not whether it did so); *see also Bailey v. State*, 38 S.W.3d 157, 158–59 (Tex. Crim. App. 2001) (per curiam) (explaining that statutory definition's use of "capable" results in it encompassing conduct that threatens death or serious bodily injury even if neither is intended).

### 2. Analysis

Deputy Mezzino testified that Calvert palmed his keys with the pointed-side down and struck downward with them, demonstrating for the jury how Calvert did so. Mezzino further testified that Calvert almost punctured his left eye, striking him right on the corner of the eye. Mezzino also sustained two puncture wounds from the keys, one to his palm and another to his forehead. Based on his training and experience as a peace officer, Mezzino concluded that keys used the way in which Calvert had used them are capable of causing death or serious bodily injury.

Photographs and body-camera footage showing Mezzino's wounds in the immediate aftermath of the assault were admitted into evidence. These two sources of evidence corroborate Mezzino's testimony about his wounds. With respect to the eye wound in particular, the photographs and footage show a good deal of blood streaming down his face from the outside corner of his left eye. Mezzino testified that while on the scene his vision was reduced due to the blood loss from his eye.

18

Deputy Baker likewise testified that blood steadily flowed from Mezzino's eye and that Mezzino had bled a significant amount. Baker further testified that Mezzino seemed almost disoriented and that he was concerned Mezzino might have sustained internal injuries in addition to the stab wounds he apparently suffered.

At the scene, Mezzino was treated first by a fellow deputy and then an emergency medical technician. Mezzino eventually went to the emergency room, where medical personnel had to glue the skin around his eye to treat the wound. He also required follow-up medical care a week later due to blurry vision and pain behind his eye. These aftereffects only resolved two weeks after the stabbing.

Finally, Calvert himself testified that he "reached up" with his car key and struck Mezzino "in the eye." Calvert described his striking motion as a "swipe."

Viewing this evidence in the light most favorable to the jury's verdict, it is legally sufficient to prove beyond a reasonable doubt that Calvert's keys were capable of causing death or serious bodily injury. Contrary to Calvert's contention, Mezzino did not simply offer a conclusory opinion that Calvert's keys were capable of causing death or serious bodily injury. The evidence of Mezzino's wounds alone, which includes puncture wounds to a palm and the forehead as well as a profusely bleeding eye wound, is sufficient to support the jury's finding in this regard. *See Tucker*, 274 S.W.3d at 692 (holding that evidence of the nature of the injury—a stab wound through the victim's arm, possibly with a key—allowed jury to infer use of

19

deadly weapon because it did not take expert testimony to recognize that such a wound "could easily have severed a major blood vessel or nerve, placing the victim's life, or at least the use of her arm, in jeopardy"). Relying on its common sense and everyday life experience, the jury was entitled to find that had Calvert's stab landed mere millimeters to the right of where it did, Mezzino's eye could have been punctured and conceivably could have been injured beyond repair. *See Edwards*, 666 S.W.3d at 574 (noting that jury may rely on common sense and experience).

That Calvert did not actually manage to stab Mezzino directly in the eye and cause protracted loss or impairment is immaterial. Calvert's keys need only have been capable of causing death or serious bodily injury. *Tucker*, 274 S.W.3d at 691.

Nor is the so-called missing evidence Calvert complains of material. A proper legal-sufficiency analysis does not turn on evidence that could have been admitted but was not. *Murray*, 457 S.W.3d at 449–50. Thus, the absence of details like the dimensions of the keys and the depth of Mezzino's eye wound do not adversely affect the legal sufficiency of the evidence the jury saw and heard. *Id.*; *see also Tucker*, 274 S.W.3d at 692 (concluding that "the absence of any detailed description of the knife or key or of exactly how appellant employed the weapon used to injure the victim" did not detract from the evidentiary sufficiency as to deadly weapon).

We overrule Calvert's second issue.

## C. Offense of evading arrest or detention

Calvert argues the evidence is legally insufficient to prove that Deputy Mezzino had a lawful reason to detain him, an element of the crime of evading arrest or detention. Calvert maintains that Mezzino lacked specific articulable facts that would have led him to reasonably suspect that Calvert had, was, or soon would be engaged in criminal activity. In particular, Calvert argues that behavior like "flashing of high beams and honking of a horn" does not establish reasonable suspicion. Calvert asserts that Mezzino had no reason to think criminal activity was afoot.

### 1. Applicable law

A person commits the offense of evading arrest or detention "if he intentionally flees from a person he knows is a peace officer" who is "attempting lawfully to arrest or detain him." TEX. PENAL CODE § 38.04(a); *see also id.* § 38.04(b)(2)(A) (elevating offense to a third-degree felony when defendant uses a vehicle to evade arrest or detention and already has a conviction for evading). Thus, the lawfulness of the officer's attempt to arrest or detain is an essential element of the offense. *Nicholson v. State*, 682 S.W.3d 238, 245 (Tex. Crim. App. 2024).

The United States Constitution's Fourth Amendment guarantees a citizen's right to be free from unreasonable searches and seizures. Article I, Section 9 of the Texas Constitution also guarantees this right. These constitutional guarantees cabin the exercise of authority by peace officers over their fellow citizens. *See Johnson v.*

*State*, 912 S.W.2d 227, 233–34 (Tex. Crim. App. 1995) (plurality op.) (guarantee in Article I, Section 9 generally corresponds to Fourth Amendment). Both guarantees require that an investigative detention be supported by reasonable suspicion to be lawful. *See Johnson v. State*, 622 S.W.3d 378, 384 (Tex. Crim. App. 2021) (saying so as to Fourth Amendment). Only when a peace officer has reasonable suspicion may the officer temporarily detain a citizen for investigation limited to the reason for the detention. *Wade v. State*, 422 S.W.3d 661, 667–68 (Tex. Crim. App. 2013).

Reasonable suspicion exists when a peace officer has a particularized and objective basis for suspecting criminal activity. *Johnson*, 622 S.W.3d at 384. An officer has reasonable suspicion when he knows of specific, articulable facts that, when combined with reasonable inferences from those facts, would lead a reasonable officer to conclude the citizen has been, is, or soon will be engaged in criminal activity. *Id.* A mere hunch—a feeling or guess based on intuition rather than known articulable facts—is not enough. *Id.* Likewise, an officer's opinions, beliefs, and unsupported conclusions are not substitutes for articulable facts. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). But the reasonable-suspicion standard is a relatively undemanding one, which is met when an officer is able to articulate facts that show some unusual activity has occurred, suggest some connection between the detainee and the unusual activity, and indicate that the unusual activity is related to crime. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). A peace

22

officer need not be able to specify a particular penal infraction to possess reasonable suspicion of criminal activity, and reasonable suspicion does not require him to negate the possibility of innocent conduct. *Johnson*, 622 S.W.3d at 384–85.

In general, application of the reasonable-suspicion standard turns on the factual and practical considerations of everyday life on which reasonable people, not legal technicians, act. *Id.* at 385. In formulating reasonable suspicion, a peace officer can draw on his own individual experience and training. *Id.*; *see also Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017) (officer may rely on his experience and specialized training to draw inferences from and make deductions about cumulative information available to him that untrained person might not). However, reliance on experience and specialized training is not enough to establish reasonable suspicion absent objective factual support. *Ford*, 158 S.W.3d at 494. As reasonableness is the focus of the reasonable-suspicion standard, it is objective in nature and disregards the officer's subjective intent. *Wade*, 422 S.W.3d at 668.

Ultimately, whether reasonable suspicion exists turns on the totality of the circumstances. *Id.*; *see also Guzman v. State*, 955 S.W.2d 85, 90 (Tex. Crim. App. 1997) (observing that lawfulness of each search and seizure depends on facts of particular case). In this context, the totality of the circumstances is limited to information actually known to the peace officer, or the cumulative information known to cooperating officers, at the time of detention. *Furr v. State*, 499 S.W.3d

23

872, 878 (Tex. Crim. App. 2016); *Duran*, 396 S.W.3d at 569–70. Reasonable suspicion cannot be based on facts an officer only learned about after the detention was underway or after-the-fact rationalizations. *Duran*, 396 S.W.3d at 569–70.

## 2. Analysis

Crediting the evidence the State introduced at trial, as the jury was entitled to do, the jury heard testimony that Calvert repeatedly went to the CenterPoint substation on County Road 831 and engaged in peculiar, confrontational behavior that concerned the off-duty peace officers who provided security at that location.

Lieutenant Schultz testified that he had two run-ins with Calvert. The first occurred almost a month before the one that led to Calvert's arrest. Schultz testified that Calvert drove slowly by the substation, eventually stopped, and then entered the substation property, shining a flashlight and then his headlights on Schultz's marked patrol car. Schultz eventually got out of his car and interacted with Calvert, informing Calvert that he was a law-enforcement officer providing security, the substation was on private property, and Calvert needed to leave the property.

A little over two weeks later, when Schultz arrived at the substation to provide security, the security officer he relieved told him that a man in a silver Ford Mustang had been on the property exhibiting a "very challenging" demeanor. Based on the description of the vehicle, Schultz thought it sounded like Calvert, and Calvert once again appeared at the substation during Schultz's shift that same evening. On this

24

second occasion, Calvert pulled onto the substation property even though Schultz was sitting in a marked patrol car with its lights activated to deter trespassing. When Schultz pulled forward to engage Calvert, Calvert "backed out and sped off."

Schultz was concerned enough by this point that he contacted the local sheriff's office and requested that it closely patrol the vicinity of the substation.

About two weeks later, Corporal Hutcherson was providing security at the substation. Before his shift, he learned of Calvert's behavior through an information-sharing application that officers who work side jobs use to communicate.

When Hutcherson arrived for his shift, Calvert drove by flashing his headlights and honking his horn. Given Calvert's repeated behavior, Hutcherson contacted the sheriff's office, which dispatched Deputy Mezzino to the substation.

Upon Mezzino's arrival, Hutcherson filled him in on the situation, including the information that Hutcherson had received regarding Calvert's activities. This information included the fact—true or not—that Calvert reportedly wanted to kill cops. While this was taking place, Calvert drove by the substation yet again, flashings his headlights and honking his horn, after which he sped away. Based on these circumstances, Mezzino got back into his patrol vehicle and pursued Calvert.

The question before us, therefore, is whether Calvert's repeated appearances at the substation in which he displayed odd and aggressive behavior toward the peace

officers providing security there was sufficient to establish reasonable suspicion for Deputy Mezzino to pursue Calvert and detain him to investigate this behavior.

Though Calvert's actions were not criminal in nature, they need not be criminal to establish reasonable suspicion for an investigative detention. *See Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (reciting that reasonable suspicion does not turn on "whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts"). The Court of Criminal Appeals' *Derichsweiler* decision is especially instructive.

In *Derichsweiler*, an atypical DWI case, the police received a report of a motorist behaving bizarrely. *Id.* at 910. While a married couple was in the drive-thru lane at a McDonald's in the early evening hours of New Year's Eve, a motorist pulled up beside them in another car. *Id.* at 909. The motorist looked directly at them and grinned for a period of about half a minute to a minute. *Id.* After the married couple had placed their order, they parked while their food was readied. *Id.* While parked, the same motorist then parked in the opposite space facing them, where he again stared and grinned at them, this time for less than half a minute. *Id.* Afterward, the motorist circled the restaurant and pulled up behind and to the left of the couple's car, staring and grinning at them for a similar length of time or longer. *Id.* At this point, fearing they were being stalked or sized up for a robbery, the couple contacted the police by telephone, requesting emergency assistance. *Id.* at 909–10. As they did

26

so, the other motorist drove into an adjacent Wal–Mart parking lot, where they saw him pull up beside at least two other parked cars. *Id.* Based on the couple's report, officers were dispatched to the scene. *Id.* at 910 & n.7. Once the officers located the motorist in question, they surrounded his car with three patrol vehicles and one of the officers then approached. *Id.* When the motorist rolled down his window in response, the officer smelled a strong odor of alcoholic beverage coming from the vehicle. *Id.* at 910–11. The officer then began a DWI investigation, which culminated in the motorist's arrest and prosecution for that offense. *Id.* at 911.

On appeal, the issue was whether officers reasonably suspected the motorist of a crime when they detained him by surrounding his car. *Id.* at 909–10 & n.7. While the Court of Criminal Appeals regarded the facts of the *Derichsweiler* case as presenting "a close call," it held that the officers had reasonable suspicion because the totality of the circumstances involved unusual activity and indicated that this unusual activity was related to crime. *Id.* at 916–17. In holding so, the court reasoned that the motorist's behavior, "while not overtly criminal in any way, was bizarre to say the least." *Id.* at 917. Because the motorist engaged in a pattern of repeated behavior, seemingly scrutinizing multiple vehicles, it reasonably gave rise to an inference that he was "looking to criminally exploit some vulnerability—a weak or isolated individual to rob or an unattended auto to burgle." *Id.* So, the court concluded "that the totality of the circumstances, viewed objectively and in the

27

aggregate, suggests the realistic possibility of a criminal motive, however amorphous, that was about to be acted on." *Id.* That was enough to allow officers to detain the motorist briefly to investigate whether criminal activity was afoot. *Id.*

Here, Calvert's behavior was likewise bizarre to say the least even though it was not overtly criminal. Even after being told that the substation was on private property under guard by a peace officer, Calvert repeatedly returned to the vicinity and either drove onto the property or lingered nearby for a short time. On each occasion that he did so, Calvert engaged in confrontational behavior that could be construed as provocative or possibly threatening, particularly in light of the information that he desired to kill cops. For example, Calvert flashed his lights or else shined them on officers, honked his horn, and sometimes entered the property.

During his own testimony, Calvert described himself as being "mad" at the peace officers providing security at the substation, and he admitted that he "flashed" his "high beams" at these peace officers more than once to express his anger. Given Calvert's admission concerning the motive for his behavior, the jury could have reasonably found that the officers in question reasonably perceived Calvert's actions to be angry or hostile, as he apparently intended them to be understood. Combined with the additional information about Calvert's desire to kill cops, Mezzino could have reasonably suspected that violence or other criminal mischief was brewing. *See id.* at 916–17; *see also Herrera v. State*, 546 S.W.3d 922, 928 (Tex. App.—Amarillo

28

2018, no pet.) (holding evidence that defendant "was engaging in a pattern of repetitious behavior that was unusual and suspicious, i.e., continuously driving through neighborhood streets and alleyways for an extended period in a manner that was suspicious to a neighborhood resident" gave rise to reasonable suspicion).

Calvert denied he desired to kill peace officers. Taking Calvert's denial as true and assuming the peace officers were therefore acting on false information about his murderous intentions, the truth or falsity of this information is immaterial because an investigative detention "that meets the test for reasonable suspicion is lawful even if the facts supporting the stop are ultimately shown to be inaccurate or false." *Icke v. State*, 36 S.W.3d 913, 916 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). In any event, as the factfinder, the jury was not obliged to credit Calvert's denial.

The evidence is legally sufficient to support the jury's finding that Deputy Mezzino's attempt to detain Calvert was lawful. As in *Derichsweiler*, the totality of the evidence in this case, which included repeated bizarre and hostile conduct directed at peace officers by a person who allegedly desired to harm officers, was enough to allow Mezzino to stop and briefly detain Calvert to investigate whether criminal activity was in fact afoot. Hence, a rational jury could have reasonably found, as this one did, that the State proved beyond a reasonable doubt the lawfully-attempted-detention element of the offense of evading arrest or detention.

We overrule Calvert's third issue.

## CONCLUSION

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Chief Justice Adams and Justices Goodman and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).